David B. Gordon (DG 0010)
Richardson & Patel, LLP
405 Lexington Avenue, 49th Floor
New York, New York 10174
(646) 755-7315
Attorneys for Plaintiff Eastern Continental Mining
and Development Ltd.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                                                                     :
EASTERN CONTINENTAL MINING AND                                       :
DEVELOPMENT LTD.,                                                    :
                                                                     :
                        Plaintiff,                                   :
                                                                     :
        vs.                                                          :   **COMPLAINT**
                                                                     :
SIGNET GROUP LLC, GERALD A. EPPNER,                                  :
RONALD SIMMERS, IAN SUBEL AND THE                                    :
SEAPORT GROUP,                                                       :
                                                                     :
                        Defendants.                                  :
                                                                     X
-----------------------------------------------------------------

      Plaintiff Eastern Continental Mining and Development Co., Ltd. ("Eastco"), by its attorneys, Richardson & Patel, LLP, for its complaint alleges:

## NATURE OF THE ACTION

      1.     This action arises out of: (a) the failure of defendant Signet Group LLC ("SG") to comply with its contractual obligation to acquire the assets that were to underlie an asset-backed securitization program that, upon effectuation, was to result in, *inter alia*, $50 million in financing for certain mining operations of Eastco; and (b) the fraudulent misrepresentations of SG and its employees, Gerald A. Eppner ("Eppner"), Ronald Simmers ("Simmers") and Ian Subel ("Subel"), who

deliberately misled Eastco about certain critical facts relating to the securitization program.

2.      SG, Eppner, Simmers and Subel told Eastco that SG had a "regular" asset-backed securitization program for financing projects in need of $25-50 million. They further represented that SG had recently "wrapped up" two finance transactions of this size, involving two other clients that had sought financing for their respective projects. But SG had never completed any such finance transactions, and SG did not have a "regular" program of the type that it told Eastco that it had.

3.      Further, SG's failure to meet its contractual commitment to acquire the assets that were to back the financing -- a pool of life insurance policies -- ensured the failure of the project. Without the assets that SG agreed to acquire, the transaction that was to result in, *inter alia*, $50 million in financing for Eastco's mining operations could not proceed.

4.      As a result of the foregoing misconduct, Eastco lost over $1 million in out of pocket costs, including substantial sums that Eastco paid SG and various affiliated entities, plus at least $19 million in annual profits that Eastco and SG agreed would result from the financing of Eastco's mining operations.

5.      Moreover, SG and The Seaport Group ("Seaport") have been unjustly enriched at the expense of Eastco, because SG and Seaport wrongfully used the resources of Eastco to build and develop an actuarial model that is at the heart of

the securitization program that they now utilize to generate multi-million dollar fees.

## PARTIES

6. Eastco is, and at all relevant times was, a United Kingdom limited company with its principal place of business located at 59-60 Cornhill, 1st Floor, London EC3V 3PD, United Kingdom. Eastco is in the business of, *inter alia*, mining for minerals in various locations in Asia.

7. Upon information and belief, SG is, and at all relevant times was, a Delaware limited liability company with places of business located in New Jersey, New York, and Pennsylvania. According to SG, SG operated a "regular, small cap, asset-backed securitization program" that businesses could utilize to obtain financing for their projects.

8. Upon information and belief, Eppner is, and at all relevant times was, the Chairman and CEO of SG, and a resident of the State of New Jersey.

9. Upon information and belief, Simmers is, and at all relevant times was, the President and CFO of SG, and a resident of New Jersey.

10. Upon information and belief, Subel is, and at all relevant times was, a Managing Director of SG, and a resident of California.

11. Upon information and belief, Seaport is, and at all relevant times was, an entity formed under the laws of the State of Delaware, with its principal place of business located at 360 Madison Avenue, New York, New York 10017. According to its website, Seaport is an investment bank.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a), because the amount in controversy between the parties exceeds $75,000, exclusive of interest and costs, and is between a citizen of a foreign state, on the one hand, and citizens of the United States, on the other.

13. Venue is proper in this district pursuant to 28 U.S.C. §1391(a)(2) because a substantial part of the events or omissions giving rise to Eastco's claims occurred in this District.

## FACTUAL BACKGROUND

A. <u>The Formation of Eastco and Its Business Plan</u>

14. Eastco was formed in May 2010 for the purpose of developing mineral resources in Asia. Eastco planned to construct networks of mineral mining and collection, processing and shipping centers

15. Eastco looked at and evaluated over 100 potential projects. After identifying the ones that were potentially the most lucrative, Eastco entered into joint ventures with the holders of six concessions for mining from the government of Indonesia, all of which were located on the islands of Sumatra and Java.

16. Eastco's plan was to focus initially on establishing mining and related operations for the mining of iron sand on Java. Iron sand mining is the fastest and least capital intensive way to enter the mining sector, and iron sands contain high amounts of iron and other valuable minerals and metals.

17. After generating revenues through its iron sand concession on Java, Eastco planned to mine for iron ore on an adjacent concession and prepare to build up additional processing for the separation and processing of titanium dioxide from the iron sands.

18. To execute its plans, Eastco needed to raise $50 million in capital, which Eppner and Simmers said SG had the unique capability to do for Eastco. In connection with its efforts to raise such funds, Eastco spent substantial sums, mainly through payments to SG, entities affiliated with SG and/or entities with which SG had or desired to have an ongoing working relationship.

19. Both Eastco and SG determined that, if the $50 million could be raised, within 12 months of the commencement of the iron sand project, Eastco would have a profit of $4 million. Eastco and SG further determined that in the ensuing years, Eastco could, through its iron sands concession, expect to have profits of $19-$78 million per year.

B.  SG's Description of its Financing Program

20. In or about November 2011, Eastco was introduced to SG.

21. SG advised Eastco that it would be able to raise the $50 million to finance Eastco's plan to develop mineral resources in Asia.

22. SG wrote that the financing could be arranged under its "regular, small cap, asset-backed securitization program, i.e., [its] SLS Financing Program for $25 to $50 million Projects." According to SG, "Such financings are known and generally accepted by institutional investors and securities underwriters. They

involve the offer and sale of debt instruments that are secured, that is 'backed,' by a basket of assets that are usually of one category or class."

23. SG further described its financing program as follows: "SGL's Financing Program relies on a diversified portfolio . . . of carefully selected life insurance policies that have been sold, or 'settled,' by seniors (referred to commonly in the marketplace as 'senior life settlements' . . . ) to fully secure a class of medium term Notes that will be sold to institutional investors . . ."

24. In short, under SG's plan: (a) it was to assemble and acquire a pool of life insurance policies; (b) thereafter, an entity was to be formed by SG to issue $500 million in notes, underwritten by Seaport, the obligations of which were to be covered by proceeds from the life insurance policies; and (c) $50 million of the $500 million in proceeds from the notes offering was to provide the funding for Eastco's mining project.

C.   The Misrepresentations of SG, Eppner, Simmers and Subel

25. Eastco would not have entered into agreements with SG and incurred over $1 million in costs if SG, Eppner, Simmers and Subel had not misled Eastco about SG's accomplishments.

26. First, by email dated March 5, 2012, Eastco's Lawrence Deneault ("Deneault") wrote to Simmers and inquired, "do you have a few reference clients now funded?' Simmers responded, "We have the first two Mini's having anticipated closing for the end of the month to the middle of April. The schedule is in the hands of the Placement Agents." However, Simmers' email was misleading. As of March

6

5, 2012, substantive, and not just scheduling, issues remained to be resolved with respect to the two deals referenced in such email. Indeed, such deals never went beyond preliminary stages.

27.     Second, SG and Eppner wrote, in an attachment to a letter from SG to Eastco dated March 26, 2012, that SG had a "regular" securitization program for financing "$25 to $50 million Projects," thereby indicating that, on at least a few occasions, financings under its program had occurred. However, as of March 26, 2012, SG did not have a "regular" securitization program for financing "$25 to $50 million Projects." Rather, no such project had ever been financed under SG's alleged program.

28.     Third, while in New York on April 17, 2012, Deneault spoke with Subel by telephone. During that call, Subel told Deneault that, while at SG, he had put together pools of life insurances policies that were being used as collateral for financings. That, however, was not true. As Subel knew, no deal had been completed by SG using any pool of life insurance policies assembled by Subel (or otherwise).

29.     Fourth, when Deneault met with Eppner and Simmers at the offices of Thompson & Knight in New York, on April 18, 2012, Simmers stated to Deneault that two deals comparable to the one from which Eastco was to benefit were "all wrapped up." But, as of April 18, 2012, SG still had not completed any such financings. Despite being present for the representation of Simmers to Deneault,

7

knowing of its falsity, and knowing that Eastco was unaware of its falsity and was relying thereon, Eppner did not correct the representation of Simmers.

30. Thus, while SG, Simmers, Eppner and Subel led Eastco to believe that SG had a track record of success, that was not the case. In actuality, SG had never accomplished any financing of the type sought by Eastco.

31. If Eastco had not been misled by the misrepresentations of SG, Eppner, Subel and Simmers, it never would have entered into a Retention Agreement, dated April 26, 2012, with SG (the "Retention Agreement"), and it never would have agreed to pay the myriad amounts that, as explained below, Eastco incurred.

32. Although Eastco asked if it could speak with the two clients whose deals were supposedly "all wrapped up," SG, through Eppner and Simmers, refused the request. SG stated that Eastco could not speak with SG's other clients because they were private companies that, for business reasons, did not want their private business dealings and relationships with financiers to be disclosed. SG did, however, allow Eastco to speak with an individual, Sean McGrath, who had not worked with SG but had been a client of Eppner's before Eppner joined SG. Mr. McGrath stated that he had had a positive experience with Eppner, although he was unable to speak to the capabilities of SG and its team.

33. Thus, nothing uncovered in the due diligence conducted with respect to SG indicated that Eastco was not being told the truth with respect to SG's track

8

record or that the representations of Eppner and his team should not have been believed.

D.   SG's Breach Of Its Obligations Under The Retention Agreement

34.   Not only did SG misrepresent facts that induced Eastco to enter into the Retention Agreement and incur extensive fees, SG also failed to discharge its obligations under the Retention Agreement.

35.   Section II(A)(6) of the Retention Agreement provided, in relevant part, as follows:

> Between the Effective Date and the completion of the Closing, [SGL] shall, to the extent legally permitted, directly or indirectly through or with the Aggregator/Provider and the Longevity Specialist, as the case may be, perform the following special services with respect to the identification, accumulation and acquisition of the SLS Portfolio . . .
>
> c.   All services deemed necessary or appropriate, applying normal and customary industry standards, for the acquisition by and the transfer to the Issuer and the Custodian Bank . . . of such Approved Assets . . .

The Retention Agreement also contained definitions for certain of the capitalized terms in Section II(A)(6) as follows: (1) "SLS" means "life insurance policies that have been settled in the senior life settlement market;" (b) "SLS Portfolio" means "the aggregation of 600 or more SLS Policies to generate one or more preliminary pools of policies . . . from which a subset ultimately can be selected to create the SLS portfolio, or pool, for [Eastco's] Project purposes . . . ;" and (c) "Approved Assets" means "interests in life insurance policies insuring the lives of United States resident senior citizens" that met certain criteria of SG.

36. Based on the plain language of Section II(A)(6), and the foregoing definitions contained in the Retention Agreement, SG made a binding commitment to Eastco to perform the services "necessary or appropriate . . . for the acquisition of" interests in 600 or more life insurance policies.

37. This commitment went to the heart of the services that SG was to provide. Without the assets that were to serve as the source of payments of the notes to investors, the notes could not be issued, and thus the funds that were to be loaned to Eastco to finance its mining project could not be raised.

38. Despite its commitment, SG never performed the services required of it under Section II(A)(6) of the Retention Agreement. SG did not, as it was required to do, perform those services "necessary or appropriate, applying normal and customary industry standards, for the acquisition" of Approved Assets.

E.   Eastco's Losses

39. SG's failure to fulfill its obligations under Section II(A)(6) of the Retention Agreement has resulted in multi-million dollar losses to Eastco. If SG had performed the services necessary to acquire the source of payments for the notes (*i.e.*, the pool of life insurance policies), there would have been no reason for the issuance of the notes, and the funding of Eastco's mining operations, not to occur. It was SG's failure in this regard that prevented the financing of Eastco's project from occurring.

40. Significantly, even SG has admitted, in writing, that Eastco did not have a meaningful alternative source of financing. In a letter to Eastco dated April

2, 2012, Eppner acknowledged that there was a "virtually complete unavailability" of "venture capital and other traditional equity funding, with the same conditions persisting with respect to commercial lending from traditional sources." Thus, as Eppner wrote, SG presented Eastco with "a unique and verifiable financial solution to provide the $50 million in new capital that . . . [was] required by [Eastco's] Project under [its] Business Plan."

41. Because SG breached its obligations under Section II(A)(6) of the Retention Agreement and the financing of Eastco's project did not occur, Eastco lost the opportunity to participate in the joint ventures that had been granted concessions by the government of Indonesia. As explained above, both Eastco and SG determined that Eastco would have earned profits of $4 million within the first 12 months of the commencement of the project and, in the ensuing years, annual profits of $19-78 million.

42. Eastco also lost, as result of SG's misconduct, the over $1 million that it paid to SG, "Associates" of SG who SG has admitted were part of the same "Strategic Structuring Group," consultants in Indonesia, and others. All of these funds were spent on preparatory work for the contemplated financing, including a high percentage spent at the direction and insistence of SG, and/or in furtherance of Eastco's efforts in Indonesia.

11

F.  SG, Eppner, Simmers and Subel Deceived Eastco for the Purpose of Inducing Eastco to Pay Fees to SG and its "Associates" in the "Strategic Structuring Group" and to Fund the Creation of an Actuarial Model that SG and Seaport Now Use to Generate Mulitmillion Dollar Fees for Themselves

43.  SG, Eppner, Simmers and Subel misled Eastco about SG's purported business successes because they knew that Eastco otherwise never would have agreed to sign the Retention Agreement and pay the myriad expenses that Eastco incurred.

44.  Eastco's expenditures have benefitted SG in two ways.  First, Eastco paid the SG team $200,000 and the "Strategic Structuring Group" members an additional amount in excess of $400,000.  Thus, SG received a direct financial benefit, as well as the benefit of cementing business relationships with others that SG now utilizes in connection with other transactions.

45.  Second, the funds that Eastco paid a member of the "Strategic Structuring Group," Risk Strategies LLC ("Risk"), were used to build the actuarial model that SG, and Seaport, now uses in its business.  Specifically, Risk needed to create a model to confirm that the cash flow from life insurance policies would be sufficient to meet obligations owed to noteholders.  The model, upon information and belief, applies certain formualae developed by Risk to actuarial data to ascertain the cash flow that can be expected from various pools of life insurance policies.

46.  SG and Seaport now use the model that Eastco paid Risk to create, which has enabled them to proceed with a different version of the asset-backed securitization program that SG touted to Eastco that does not focus on project

finance. Using this model, SG and Seaport are now generating multimillion dollar fees.

## FIRST CAUSE OF ACTION
### (Breach of Contract–Against SG)

47. Eastco repeats and realleges the allegations contained in paragraphs 1 through 46 above.

48. Eastco and SG are parties to the Retention Agreement.

49. Pursuant to Section II(A)(6) of the Retention Agreement, SG agreed to perform "[a]ll services deemed necessary or appropriate, applying normal and customary industry standards, for the acquisition . . . of [the] Approved Assets . . ."

50. SG breached the foregoing provision of Section II(A)(6) of the Retention Agreement.

51. Eastco has fulfilled all of its obligations that have arisen under the Retention Agreement.

52. As a direct and proximate result of SG's breach of the Retention Agreement, Eastco has suffered damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Fraudulent Inducement--Against SG, Eppner, Simmers and Subel)

53. Eastco repeats and realleges the allegations contained in paragraphs 1 through 52 above.

54. SG, Eppner, Simmers and Subel made the following representations to Deneault of Eastco: (a) by email dated March 5, 2012, in response to a prior email of Deneault inquiring whether SG had "a few reference clients now funded," SG,

13

through Simmers, responded, "We have the first two Mini's having anticipated closing for the end of the month to the middle of April. The schedule is in the hands of the Placement Agents;" (b) SG, through Eppner, wrote, in an attachment to a letter dated March 26, 2012, that SG had a "regular" securitization program for financing "$25 to $50 million Projects;" (c) during a telephone call, Subel told Deneault that, while at SG, he had put together pools of life insurances policies that were being used as collateral for financings; and (d) at a meeting, SG, through Simmers, told Deneault that two deals comparable to the one from which Eastco was to benefit were "all wrapped up."

55. All of the foregoing representations were false and/or misleading, and SG knew, and Eppner, Simmers and Subel each knew with respect to their own respective representations, that they were false and/or misleading when they made the representations.

56. Although present when Simmers told Deneault that two deals comparable to the one from which Eastco was to benefit were "all wrapped up," knowing of the representation's falsity, and knowing that Eastco was unaware of its falsity and was relying thereon, Eppner did not correct the representation of Simmers.

57. SG, and Eppner, Simmers and Subel with respect to their own respective representations and omissions, made the foregoing material misrepresentations and omissions to Eastco and with the intent that Eastco act and rely thereon, so that Eastco would sign the Retention Agreement, pay fees to SG,

pay fees to the purported "Strategic Structuring Group" and others, and finance the development of the actuarial model by Risk that SG and Seaport now utilize in their businesses, and for the purpose of defrauding Eastco.

58. Eastco reasonably relied on the foregoing misrepresentations and omissions. In deciding to enter into the Retention Agreement and pay the amounts described above, Eastco had a justifiable right to rely on the information provided by SG, Eppner, Simmers and/or Subel; Eastco relied on their truthfulness; and Eastco was ignorant of the falsity of the information provided by SG, Eppner, Simmers and/or Subel. Eastco would not have entered into the Retention Agreement and made the payments that it made had it known that SG, Eppner, Simmers and Subel were engaging in the fraudulent behavior described herein.

59. As a direct, consequent, proximate and foreseeable result of the fraudulent misrepresentations of SG, Eppner, Simmers and Subel, and the reliance thereon by Eastco, Eastco has been injured.

60. The misconduct of SG, Eppner, Simmers and Subel was willful, malicious, wanton, gross and egregious.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment--Against SG and Seaport)

61. Eastco repeats and realleges the allegations contained in paragraphs 1 through 60 above.

62. SG and Seaport have benefitted and been enriched by receiving financial benefits at the expense of Eastco. Specifically: (a) Eastco paid Risk to develop a valuable actuarial model, to be used in connection with debt offerings,

that determines whether cash flow from life insurance policies will be sufficient to, *inter alia*, meet obligations owed to holders of the debt; (b) SG and Seaport now utilize that model in connection with transactions not involving Eastco; and (c) SG and Seaport are using the model paid for by Eastco to generate multimillion dollar fees.

63. Equity and good conscience require that SG and Seaport turnover such financial benefits to Eastco.

## JURY DEMAND

Eastco hereby demands a trial by jury of all issues so triable.

WHEREFORE, Eastco respectfully requests that the Court enter judgment:

(i) on the First Cause of Action, in favor of Eastco and against SG, for compensatory damages in an amount to be determined at trial;

(ii) on the Second Cause of Action, in favor of Eastco and against SG, Eppner, Simmers and Subel, for compensatory and punitive damages in an amount to be determined at trial;

(iii) on the Third Cause of Action, in favor of Eastco and against SG and Seaport, for compensatory and punitive damages in an amount to be determined at trial;

(iv) awarding Eastco costs and attorneys' fees; and

(v) awarding Eastco such other and further relief as the Court deems just and proper.

Dated: New York, New York
      March 22, 2013

                               RICHARDSON & PATEL, LLP

                               By: _____
                                   David B. Gordon (DG 0010)
                              405 Lexington Avenue, 49th Floor
                              New York, New York 10174
                              Telephone: (646) 755-7315
                              Attorneys for Plaintiff Eastern Continental
                              Mining and Development Ltd