UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 29, 2015

------------------------------------------------------------- X

EASTERN CONTINENTAL MINING
AND DEVELOPMENT LTD.,

      Plaintiff,

   -v-

SIGNET GROUP LLC, et al.,

      Defendant.

------------------------------------------------------------- X

:   13-cv-1930 (KBF)

:   OPINION & ORDER

KATHERINE B. FORREST, District Judge:

  This action arises out of defendant Signet Group LLC's ("Signet") alleged breach of an April 18, 2012 Retention Agreement ("Retention Agreement") entered into with plaintiff Eastern Continental Mining and Development Ltd. ("Eastco"). The Retention Agreement provided for a series of joint efforts which would, if all had gone well, provide Eastco with a $50 million loan to participate in a mining venture in Indonesia. A successful financing transaction would require, on the one hand, that Eastco have a viable business plan and joint venture partner lined up, and that, on the other hand, Signet (with other service providers) have a pool of assets lined up to be used as collateral for a notes issuance and loan. But all did not go well. Eastco now argues that Signet breached the Retention Agreement by—irrespective of what Eastco was able to accomplish vis-à-vis the business side of things—failing to line up the pool of assets. Indeed, according to Eastco, Signet was itself obligated to actually acquire those assets by a date certain.

Eastco's breach claims center on Section II(A)(6) of the Retention Agreement, which required Signet to "perform the services 'necessary or appropriate . . . for the acquisition of' interests in 600 or more life insurance policies [i.e. the pool of assets] and/or to 'assure' the acquisition of such policies." (Second Am. Compl. ¶ 34, ECF No. 108.)  Eastco asserts that the word "assure" necessarily entails actions including acquisition by Signet itself.  Thus, according to Eastco, Signet breached this provision by failing itself to acquire ownership of the life insurance policies that would be used to secure the loan or, alternatively, to obtain signed purchase agreements for those policies prior to August 18, 2012, the date that Eastco claims was the project deadline.  Signet has also filed a counterclaim against Eastco for $250,000 in fees relating to the project that Signet claims remain unpaid.

Upon weighing the evidence in this summary bench trial on the papers pursuant to the parties' consent under Fed. R. Civ. P. 52, the Court concludes that Signet did not breach Section II.A.6 of the Retention Agreement.  At the time the parties terminated their relationship, Signet's performance with respect to "assur[ing] the acquisition of [the] policies" was not yet due.  Signet's motion for partial findings is therefore GRANTED and Eastco's breach of contract claim is DISMISSED.  Because the Court concludes that genuine issues of fact remain with respect to Signet's counterclaim (a claim which is not part of the Court's summary bench trial procedure), Eastco's motion for summary judgment as to that claim is DENIED.

I.    PROCEDURAL HISTORY

On March 22, 2013, plaintiff Eastco filed its initial complaint against defendant Signet and several other individuals and entities.  (ECF No. 1.)  It amended that complaint on May 30, 2013.  (ECF No. 33.)  On December 9, 2013, the Court granted Signet's motion to dismiss Eastco's fraudulent inducement and unjust enrichment claims and denied the motion with respect to Eastco's breach of contract claim.[1]  (ECF No. 52.)

On July 22, 2014, Eastco filed the current operative complaint, the Second Amended Complaint, which seeks damages under four causes of action for breach of contract and fraudulent transfer.  (ECF No. 108.)  The breach of contract claims in the current operative complaint concern Signet's activities with respect to Section II.A.6, as discussed above.  Eastco has not, for instance, claimed a breach based on Signet's cessation of performance in December 2012.  On August 4, 2014, Signet moved for partial summary judgment as to Eastco's second and third causes of action.  (ECF No. 110.) The Court denied that motion on September 19, 2014.[2] (ECF No. 124.)  On October 3, 2014, Signet filed an answer to the Second Amended Complaint and asserted a counterclaim alleging that Eastco owes it $250,000 in fees pursuant to the Retention Agreement.  (ECF No. 129.)

On October 31, 2014, the parties cross-moved for summary judgment on Eastco's breach of contract claim; Eastco also moved for summary judgment on

---

[1] The Court filed a corrected version of that decision on June 20, 2014.  (ECF No. 96.)

[2] Because any remaining defendant's liability under the second, third, and fourth causes of action stated in the Second Amended Complaint is dependent on Signet's liability for breach of contract under Eastco's first cause of action, the Court need not and does not discuss those other claims further.

Signet's counterclaim.  (ECF Nos. 133, 134.)  Those motions became fully briefed on November 21, 2014.  (ECF Nos. 153, 154.)  Due to the extensive documentary evidence and declarations submitted in relation to those motions, on November 25, 2014 the Court inquired as to whether the parties would consent to a trial on the papers, allowing the Court to weigh the evidence, if the Court were to determine that factual determinations become necessary to resolve Eastco's breach of contract claim.  (ECF No. 155.)  The Court also stated that the parties would be given an opportunity to provide any additional materials to aid the Court in making factual determinations to the extent that factual determinations would be necessary.[3] (ECF No. 155.)  In response to the Court's inquiry, the parties submitted letters on December 2, 2014 (ECF Nos. 156, 157), and, after the Court held a status conference on December 3, 2014, submitted additional letters consenting to a trial on the papers and outlining their respective positions on December 8, 2014 (ECF Nos. 159, 60).  The Court granted the parties permission to file responses to each other's December 8, 2014 letters (ECF No. 162), and each did so on December 11, 2014 (ECF Nos. 163, 164).

On December 15, 2014, the Court ordered that Eastco's breach of contract claim would, on consent, proceed to a trial on the papers pursuant to Fed. R. Civ. P. 52, allowing the Court to weigh the evidence and make factual determinations to

---

[3] Had the Court simply denied the parties' cross-motions for summary judgment, this action would have been tried to the bench in any event.  Pursuant to Section XII.B of the Retention Agreement, both parties waived any jury trial right for any claim arising out of that agreement.  (10/31/14 Kessler Decl., Ex. 15 ("Retention Agreement"), ECF No. 137-15.)  After the Court dismissed Eastco's fraud claims in its decision on Signet's motion to dismiss the First Amended Complaint, Eastco withdrew its demand for a jury trial on January 24, 2014.  (ECF No. 61.)

the extent necessary.[4]  (ECF No. 165.)  The Court also laid out a schedule for any further submissions that the parties deemed appropriate on the issue whether Section II(A)(6) of the Retention Agreement was breached, allowing each party two additional rounds to submit materials.  (ECF No. 165.)  Pursuant to that schedule, Eastco filed a brief on December 30, 2015 along with evidentiary material that included several declarations, deposition excerpts and exhibits.  (ECF No. 166.)  Signet then filed a motion for judgment on partial findings on January 14, 2015, attaching two declarations and numerous exhibits.  (ECF No. 171.)  Eastco filed a brief opposing that motion on January 21, 2015 (ECF No. 173), along with two additional supporting declarations (ECF Nos. 174, 75).  Signet filed its final reply brief on January 28, 2015 (ECF No. 179), along with a reply affirmation including several supporting exhibits (ECF No. 180).  The significant evidentiary material submitted with the parties' final two rounds of briefing was only a supplement to the substantial evidentiary submissions made by the parties in support of their summary judgment motions.  The Court has considered all of that material.

According to the trial procedures to which the parties consented, each party submitted declarations and deposition testimony from witnesses along with documentary exhibits.  Each side had multiple opportunities to respond to the

---

[4] The Court did not inquire, and the parties therefore did not consent, as to a trial on the papers with respect to Signet's counterclaim.  Thus, this Opinion & Order is not directed toward that claim.  The Court denies Eastco's motion for summary judgment as to Signet's counterclaim because genuine issues of fact remain as to the scope of Signet's voluntary abatement of fees beginning in August 2012.  (The Court notes as well that Eastco effectively abandoned its summary judgment motion on Signet's counterclaim as it did not address that claim in its reply brief in support of that motion. (See ECF No. 154.))  Signet's counterclaim is therefore the sole remaining live claim following this decision, and the Court does not address it further here.

submissions of the other side with additional declarations and documentary exhibits.  As set forth below, while the Court believes that Eastco's claim can largely be resolved as a matter of law based on the interpretation of the Retention Agreement and the accompanying contract documents incorporated therein, both parties submitted a significant amount of extrinsic evidence and other evidentiary material, and the Court has considered and will address that evidence as well.

In relation to the parties' summary judgment motions, Eastco and Signet submitted declarations and/or deposition excerpts from the following witnesses: Lawrence Deneault and David Pape, Eastco's Co-Chairmen; David Feldman, Eastco's deal counsel for the project; Sandra Giuffre, an actuarial specialist whose firm, Risk Strategies LLC ("RSL"), was retained by Eastco for the purpose of identifying and aggregating life insurance policies in relation to the financing project; Edward Santos, who introduced Eastco and Signet for the purpose of working together on Eastco's financing; Gerald Eppner, Signet's CEO; Manon Manugra, who provided consulting services to Eastco in Indonesia; and Akhmad Johari Damanik, an attorney licensed to practice law in Indonesia; Eastco also submitted an expert report by Andrew Wells, a mining consultant.  (E.g., ECF Nos. 137, 142, 147, 152.)  The parties also submitted documentary exhibits including the Retention Agreement, other documents that were incorporated into the contract, and pertinent email communications between the parties.  (E.g., ECF Nos. 137, 142, 146, 147, 152.)

Following the Court's invitation to make any further submissions to aid the Court in making factual determinations as part of a summary bench trial on the papers, the parties submitted a significant amount of additional evidentiary material.  These materials included additional declarations and/or deposition excerpts for several witnesses, including from Gerald Eppner, Ronald Simmers (co-owner, with Eppner, of Signet), David Feldman, Lawrence Deneault and David Pape.  (ECF Nos. 166, 170, 171, 174, 175, 180.)  The parties also submitted more documentary exhibits, including email communications. (ECF Nos. 170, 171, 180.)

Based on the record presented by the parties, and in accordance with Fed. R. Civ. P. 52, the following constitutes this Court's factual findings and conclusions of law.[5]

## II.   FINDINGS OF FACT

### A.   <u>Parties</u>

Eastco is a United Kingdom limited company formed in May 2010 to develop mineral resources in Asia.  (11/14/14 Deneault Decl. ¶ 2, ECF No. 142-1; 10/31/14 Kessler Decl., Ex. 15 ("Retention Agreement"), ECF No. 137-15.)  Eastco's plan was to construct networks of mineral mining and collection, processing and shipping centers.  (11/14/14 Deneault Decl. ¶ 2.)  Eastco's Co-Chairmen are Lawrence Deneault and David Pape.  (10/31/14 Kessler Decl., Ex. 21 at 8 ("Business Plan"),

---

[5] In making these findings, the Court does not make any credibility determinations but rather weighs the evidence and makes findings of fact under a preponderance of the evidence standard. The Court notes that it makes factual findings and conclusions of law only to the extent necessary to resolve Eastco's breach of contract claim.  This Opinion & Order does not purport to address the numerous factual disputes and issues raised in the parties' materials that would not impact the Court's resolution of Eastco's claim.

ECF No. 137-21.)  Pape deferred to Deneault in financing matters and Deneault deferred to Pape regarding actual mining issues.  (10/31/14 Kessler Decl., Ex. 2, Pape Tr. 411, ECF No. 137-2; 10/31/14 Kessler Decl., Ex. 1, Deneault Tr. 43-44, ECF No. 137-1.)  Manon Manugra is a consultant who served as head of Eastco's representation on the ground in Indonesia.  (Business Plan at 8.)

Edward Santos first introduced Eastco to Signet in late 2011 to facilitate Eastco's goal of raising funds to obtain a $50 million loan.  (1/14/15 Eppner Decl. ¶ 4, ECF No. 171; 11/14/14 Deneault Decl. ¶ 3.)  Signet is a Delaware limited liability company with its place of business located in New Jersey.[6]  (Retention Agreement at 1.)  Gerald Eppner is Signet's CEO and Chairman and Ronald Simmers is its co-owner.  (1/14/15 Eppner Decl. ¶ 1; 1/12/15 Simmers Decl. ¶ 1, ECF No. 170.)  Eppner, the primary drafter of the Retention Agreement, has decades of experience drafting complex legal documents and has a reputation as a highly skilled legal practitioner.  (12/23/14 Feldman Decl. ¶¶ 4-5, ECF No. 166-1.)  Pursuant to a finder's fee agreement with Eastco, Santos was to receive a $1 million fee (to be shared equally with Robbie Lyle) upon successful completion of Eastco's sought funding.  (10/31/14 Kessler Decl., Ex. 18, ECF No. 137-18; Deneault Tr. 81-82.)  The finder's fee was to come out of the proceeds of Eastco's $50 million loan.  (Deneault Tr. 81-82.)

---

[6] Eastco alleges that defendant Cygnus LS, LLC was formed on July 1, 2013 and is the successor entity of Signet; as a result, Eastco claims that Cygnus may be held liable for Signet's breach of the Retention Agreement.  (Second Am. Compl. ¶¶ 41-44.)  In light of the Court's determination that Signet is not liable for breach of contract, the Court need not resolve this factual question.

B.     The Contract

Eastco and Signet executed a Retention Agreement, dated as of April 18,

2012, pursuant to which Eastco retained Signet to provide specified services in

connection with ECL's desire to obtain a $50 million loan to finance a sand mining

project in Indonesia.[7]  (See Retention Agreement.)  Eastco planned to repay the loan

through the sale of iron ore extracted from iron sands, sand sales and titanium

dioxide sales.  (Deneault Tr. 94.)  Prior to signing the Retention Agreement, in

March 2012 Eppner had participated in a lengthy conference call with Simmers,

Deneault and Pape in which Eppner laid out Signet's proposal for the financing

process.  (1/14/15 Eppner Decl. ¶¶ 5-6.)  That call was followed by a March 26, 2012

Proposal Letter (the "Proposal Letter") that Signet sent to Eastco; the Proposal

Letter was intended to memorialize the substance of the conference call.  (1/14/15

Eppner Decl. ¶ 8.)

1.     Overview of the Financing Process

The Retention Agreement, as supplemented by the documents incorporated

by reference into it,[8] explains the process for the parties' contemplated financing

project.  The ultimate mechanism that would be used to provide Eastco with its

---

[7] Although Eastco had retained David Feldman as counsel, Deneault instructed Feldman not to read
or review the Retention Agreement.  (See Deneault Tr. 126-28; 10/31/14 Kessler Decl., Ex. 3,
Feldman Tr. 92, ECF No. 137-3.)  Eastco represented in the Retention Agreement that it "read th[e]
Agreement and [] received such legal and other counsel and advice as it deemed necessary or
appropriate for its full and complete understanding of the terms, provisions and conditions."
(Retention Agreement at 29.)

[8] The documents explicitly incorporated by reference into the Retention Agreement include the
Mutual Non-Disclosure and Non-Circumvention Agreement dated November 23, 2011 ("MNDNCA"),
the Proposal Letter dated March 26, 2012, and Eastco's operative Business Plan.  (See Retention
Agreement at 2, 30.)  Deneault understood that these documents were part of the agreement.
(Deneault Tr. 118-22.)

sought loan would be a Notes offering to sophisticated investors through a placement agent or underwriter.[9]  (Retention Agreement at 1-2.)  The Notes, which would generate total gross proceeds of approximately $350 million (with proceeds of $50 million to be provided to Eastco after the payment of all costs and expenses), were to be secured by a pool of senior life settlement insurance policies (the "SLS Portfolio").  (Retention Agreement §§ I.A, I.B; 10/31/14 Kessler Decl., Ex. 16 at 7-8 ("Proposal Letter"), ECF No. 137-16.)  Pursuant to Section I.B of the Retention Agreement, the proceeds of the Notes offering would "be applied, first, to provide $50,000,000 to the Project, and then to acquire and hold, in a custodial account . . . the SLS Portfolio purchased from or through" Signet's Life International Solutions Division ("SILS").  (Retention Agreement § I.B.)  The SLS Portfolio was to consist of a preliminary set of several hundred life insurance policies to be identified, accumulated and acquired by SILS.  (Retention Agreement § I.B.)  SILS, in conjunction with RSL, a firm that provides actuarial services, was to use certain specified criteria from which a subset of policies could ultimately be selected to create the SLS Portfolio.  (Retention Agreement § I.B.)  The Proposal Letter states that part of the net proceeds of the Notes would, through SILS, be used to acquire

---

[9] The Seaport Group, which this Court dismissed as a defendant in this action in its December 9, 2013 Memorandum Decision & Order (ECF No. 52), was identified as the primary prospective underwriter for the financing.  (Deneault Tr. 146.)  While Deneault states that Signet represented prior to the execution of the Retention Agreement that Seaport had approved the Business Plan and agreed to act as underwriter (12/24/14 Deneault Decl. ¶ 7, ECF No. 166-2; 1/21/15 Deneault Decl. ¶ 6, ECF No. 175), the weight of the evidence, including the Retention Agreement itself, shows that Seaport was not engaged as an underwriter prior to the Retention Agreement (see, e.g., Retention Agreement; 1/28/15 Eppner Reply Decl. ¶ 15, ECF No. 180).  The Court finds significant that Seaport was not identified in the contract documents as the underwriter, despite the fact that the Retention Agreement specifically names several of the other necessary service providers.  The Court also finds significant that Section II.A.8 of the Retention Agreement stated that one of Signet's remaining duties would be to "negotiate" the retention of an underwriter.  (Retention Agreement § II.A.8.)

and hold the SLS Portfolio and turn it over to a trust account maintained by a Custodian Bank.  (Proposal Letter at 8, 11.)  The Retention Agreement states explicitly that "[n]othing herein shall require that [Signet] purchase or otherwise acquire any securities or other assets, or any interests therein, and nothing herein shall preclude [Signet] from purchasing any securities, other than Notes, in the ordinary course of its business."  (Retention Agreement § XIII.C.)  There is nothing ambiguous about that statement.

The Proposal Letter explains that the financing project would consist of three phases over an approximately three-to-five month period to be "pursued along parallel tracks which . . . start at different dates [and] come together at the . . . Closing."  (Proposal Letter at 11.)  In Section II.A.5 of the Retention Agreement, Signet "confirm[ed] that it believe[d]" that the Closing would occur within a period of three or four months from the date of execution of the Retention Agreement. (Retention Agreement § II.A.5.)  The Proposal Letter contemplates that the first phase would last approximately one-and-a-half to two-and-a-half months.  (Proposal Letter at 11.)  One track involves RSL in the modeling process.  (Proposal Letter at 11.)  The second track involves SILS's commencement of the SLS Portfolio identification and "informal" accumulation process.  (Proposal Letter at 11.)  The third track involves the work behind organizing the Issuer, preparing legal contracts between the parties, completing the Private Placement Memorandum, and engaging a private placement agent for the Notes offering and a custodian bank to

maintain the SLS Portfolio.[10]  (Proposal Letter at 11.)  In the second phase, also expected to last one-and-a-half to two-and-a-half months, the Notes would be offered to investors who have been identified by the private placement agent. (Proposal Letter at 11.)  The third and final phase, as detailed below, involves the "simultaneous Closing" and fund transfers between the various players.  (Proposal Letter at 11-12.)

The various tracks begin converging at the end of the second phase, approximately two weeks prior to the Closing, at which time a pre-Closing is held. (1/14/15 Eppner Decl. ¶ 26.)  The pre-Closing occurs after the retained underwriter has identified the investors for the Notes and the terms of the Notes are final; the purpose of the pre-Closing is to allow the Closing participants to review the required documents and resolve any last-minute issues.  (1/14/15 Eppner Decl. ¶ 26.)  Among the agreements reviewed during the pre-Closing are the purchase agreements with the Notes investors and the purchase agreements with the sellers (which consist of sophisticated financial institutions) of the life insurance policies that will comprise the final SLS Portfolio.  (1/14/15 Eppner Decl. ¶ 27.)  The policy purchase agreements for the life insurance policies that comprise the SLS Portfolio are the contracts pursuant to which the sale of those policies to the Notes Issuer is effected at the Closing.  (1/14/15 Eppner Decl. ¶ 26.)  Such purchase agreements are entered into on a "subject to completion of financing by a prescribed date basis." (11/14/14 Eppner Decl. ¶¶ 5-6, ECF No. 147.)  The evidence in the record clearly

---

[10] Eppner testified that the financing process as involving four parallel tracks, rather than the three tracks explicitly mentioned in the Proposal Letter.  (See 1/14/15 Eppner Decl. ¶¶ 20-24.).  The Court notes that the distinction is irrelevant for purposes of Eastco's breach claim.

demonstrates that life insurance policy purchase agreements are typically not entered into until shortly before the pre-Closing, at which it is evident that the Closing is very likely to occur.  (1/14/15 Eppner Decl. ¶¶ 27, 30; 1/28/15 Eppner Decl. ¶¶ 5-6, ECF No. 180.)

The financing process culminates with a simultaneous Closing.  The Closing involves the simultaneous (or near simultaneous) flow of funds from the Notes investors to the Issuer, from the Issuer for the payment and reimbursement of the offering's commissions, fees and expenses, from the Issuer for use by Eastco pursuant to its Business Plan, from the Issuer to the commercial bank and the hedging transaction participants, and shortly thereafter from the commercial bank to SILS, and from SILS to the sellers of the policies that make up the SLS Portfolio. (Proposal Letter at 11-12.)

### 2.   Signet's Relevant Obligations

The Retention Agreement defines Signet's role as "rendering advisory and consultative services on an exclusive basis in connection with the structuring and preparation of the offering and sale, by and on behalf of an Issuer to be organized by [Signet]," of Notes to yield a loan of $50 million for use by Eastco.  (Retention Agreement § I.A.)  Section II of the Retention Agreement specifies Signet's obligations to be performed prior to the Closing, including, inter alia, that Signet had to cause the due organization of a management company that would offer the Notes, cause the management company's retention of legal counsel to represent it in connection with the financing transactions, recommend special lead deal counsel (identified in the Retention Agreement as Bingham McCutchen) to be retained by

the Notes Issuer, recommend the bank or banks to serve as the custodian bank of the notes, the notes indenture trustee, and notes transfer agent, and negotiate the retention of an underwriter.  (Retention Agreement § II.A.)  The Retention Agreement also imposed various duties on Signet following the Closing and up until the maturity date of the Notes, including servicing and monitoring the SLS Portfolio and other enumerated tasks.  (Retention Agreement § II.B.)  The Retention Agreement defines "Closing" to mean "the closing of the offering and sale of the Notes to the Investors."  (Retention Agreement App. 1.)

Among the sub-sections containing Signet's obligations is section II.A.6, the provision that serves as the basis for Eastco's breach of contract claim.  Section II.A.6 states that "[b]etween the Effective Date and the <u>completion of the Closing</u>, [Signet] shall . . . directly or indirectly . . . perform the following specific services with respect to the identification, accumulation and acquisition of the SLS Portfolio."  (Retention Agreement § II.A.6 (emphasis added).)  Such services included "[i]dentification of "Assets" and "Approved Assets" and "[i]ntroduction of the Issuer or its authorized representatives to sellers and prospective sellers of such Approved Assets."  (Retention Agreement § II.A.6.)  As particularly relevant here, Signet was also required to perform "[a]ll services deemed necessary or appropriate, applying normal and customary industry standards, for the acquisition by and transfer to the Issuer and the Custodian Bank . . . of such Approved Assets, including steps to assure, under commercially reasonable standards that are normal and customary in the industry, the legal transfer of each and all of such Approved

Assets and their compliance with the standards for determining that an asset is both an 'Asset' and an 'Approved Asset.'"  (Retention Agreement § II.A.6.c.)  The Retention Agreement does not itself detail the duration of the Closing (though the word "completion" suggests some time span) or how far in advance of the "completion of the Closing" the steps outlined in Section II.A.6 were to occur.

3.  <u>Eastco's Relevant Obligations</u>

Prior to execution of the Retention Agreement, Eastco presented Signet with a written business plan that, as noted above, was among the documents incorporated into the Retention Agreement.[11]  (Retention Agreement at 30; Deneault Tr. 118-122.)  The Mutual Non-Disclosure and Non-Circumvention Agreement stated that Eastco furnished an initial business plan to Signet on November 6, 2011, and said that the initial business plan "may be amended . . . to reflect current developments" and that if it is amended, the amendment "shall be furnished promptly to Signet."[12]  (MNDNCA at 1-2.)  Signet knew at the time that the Retention Agreement was entered into that Eastco was not yet an operating mining business.  (11/14/14 Deneault Decl. ¶ 24, ECF No. 142-1.)  In the May 2012 amended version of the Business Plan, Eastco represented that it had an agreement

---

[11] The Business Plan was incorporated into the parties' Mutual Non-Disclosure and Non-Circumvention Agreement, which was itself incorporated into the Retention Agreement.  (<u>See</u> Retention Agreement at 30; 1/14/15 Eppner Decl., Ex. 1 ("MNDNCA"), ECF No. 171-1.)

[12] The parties dispute whether Eastco ever "furnished" an amended version of the November 6, 2011 business plan, including the version attached to the May 18, 2012 email from Ron Simmers to James Fincher.  (<u>See</u> 10/31/14 Kessler Decl., Ex. 21 ("Business Plan"), ECF No. 137-21.)  The Court finds, by a preponderance of the evidence, that Deneault sent Signet an updated business plan in May 2012, and that Deneault approved Signet's edits to the May 2012 business plan which was sent to prospective underwriters.  (<u>See</u> 1/14/15 Eppner Decl., Exs. 17-19, ECF Nos. 171-17-19.)  The Court thus finds that the attachment to Simmers's May 18, 2012 email was the operative Business Plan of Eastco from May 2012.

in principle with the current holder of the pertinent concessions in Indonesia to create a joint venture, subject only to receipt of the $50 million loan.  (Business Plan at 2.)  The Business Plan stated that the "existing concession already has approved plans for a shipping jetty, and has barrier islands for protection from high storm waves." (Business Plan at 11.)

Among the obligations that Eastco assumed in the Retention Agreement, Eastco was required to "promptly notify [Signet], in writing, in the event of any change or event that is likely to affect [Eastco's] Business Plan in any material respect or create a materially adverse outcome for the transactions contemplated." (Retention Agreement § I.C.)  Eastco also agreed that it would "take all reasonably necessary or advisable actions . . . to ensure the ongoing accuracy and completeness of its respective representations and warranties that are set forth in this Agreement."  (Retention Agreement § VI.A.3.)  Eastco also represented and warranted that "[i]t has not undertaken any action that would render any statement of material fact in the Private Placement Memorandum to be incorrect or misleading."  (Retention Agreement § VII.A.5.)  Deneault understood that potential investors and underwriters would be relying on representations in the Business Plan, as details relating to Eastco's business in the Private Placement Memorandum would ultimately derive from statements in the Business Plan. (Deneault Tr. 292-99; 1/14/15 Eppner Decl. ¶ 54; see also Proposal Letter at 9 (stating that Eastco is "responsible for implementing the Business Plan to support

16

the Project's obligations under the Financing Program and managing the Project to
fulfill the results contemplated by the Business Plan").)

Section III of the Retention Agreement outlined Signet's compensation and
fees (including certain monthly fees) at the various stages of the financing process;
these included a "success structuring fee" of up to 3% of the principal amount of the
Notes payable only upon a successful Closing.  (Retention Agreement § III.B.3.)  The
Proposal Letter also included the same description of fees.  (Proposal Letter at 12-
14; see also 1/14/15 Eppner Decl. ¶ 10.)

4.    Termination

The Retention Agreement provides that Eastco "may terminate this
Agreement . . . at any time, with or without cause, without penalty, during the
period that begins immediately after the Effective Date [of the Retention
Agreement] and ends upon the Closing of the offering and sale of the Notes, by
giving [Signet] at least (10) days' prior written notice thereof."  (Retention
Agreement § VIII.A.2.)  The Retention Agreement otherwise provides for an event-
based term for the contract, stating that it "shall terminate on the later to occur of
the Maturity Date of the Notes or the dissolution and winding up of the [Notes']
Issuer."  (Retention Agreement § VIII.A.1.)

While the Retention Agreement does not provide Signet with equal
termination rights, or contain a date-based deadline for Signet's performance, it
does state that Signet "confirms that it believes the [financing] can, and will, be
completed within, and the Closing will occur at the end of a period of three (3) to
four (4) months . . . subject to delays or abandonment . . . due to matters of _force_

17

*majeure* such as . . . the inability of [Signet or RSL] to perform [their] duties as set forth or described herein." (Retention Agreement § II.A.5.)

C.     Execution of Signet's Financing Plan

1.     The Parties' Performance under the Retention Agreement

As it turned out, Eastco's business was not at a sufficiently advanced stage to secure an underwriter, ultimately preventing the project from reaching the latter stages of a successful Notes offering. The Business Plan did not reflect the true state of Eastco's business and Eastco failed to update and provide important documentation to Signet that was needed to back up the assertions made in Eastco's Business Plan. (See, e.g., 1/14/15 Eppner Decl. ¶¶ 51-52, 68-70; 1/14/15 Simmers Decl. ¶¶ 3-4.) Eastco also misrepresented the status of its joint venture in Indonesia, and did not disclose its agreement to provide a $1 million finder's fee to Ed Santos and Robbie Lyle or alert Signet to the significant drop in the iron ore market that developed in June 2012. (1/14/15 Eppner Decl. ¶¶ 60-63; see 1/14/15 Eppner Decl., Ex. 24, ECF No. 171-24 (June 2, 2012 email from Pape to Eastco's prospective joint venture partner "Surya" stating that "the world market for iron ore has collapsed and will get worse before it gets better.")

Eastco never presented Signet with documentation proving that it had entered into a joint venture or that it had acquired the mining concessions necessary to conduct its operations as described in its Business Plan; the only document Eastco did submit—and not until the discovery phase of this litigation— was a preliminary non-binding Memorandum of Understanding ("MOU") dated May

18

4, 2012 between Pape and an individual named "Surya."[13]  (1/14/15 Eppner Decl. ¶

60; 1/14/15 Eppner Decl., Ex. 23, ECF No. 171-23.)  The lack of documentation

supporting Eastco's representations in its Business Plan contributed to the failure

of the transaction to progress toward a Closing, as the content of the Business

Plan—and documentation to back it up the statements therein—were significant to

prospective underwriters and potential Notes investors in deciding whether to

participate in the project.  (1/14/15 Eppner Decl. ¶¶ 51-52, 68-70; 1/14/15 Simmers

Decl. ¶¶ 3-4.)  Pape acknowledged in his testimony that given the actual status of

---

[13] Before terminating its relationship with Eastco, Signet repeatedly requested documentation of Eastco's joint venture agreement with its purported Indonesian counterparty (and other materials) in order to allow Signet to provide that documentation to Seaport for presentation to potential investors in the Notes. (E.g., 10/31/14 Kessler Decl., Ex. 24, ECF No. 137-24; 1/14/15 Eppner Decl. ¶¶ 57-58; 1/12/15 Simmers Decl. ¶¶ 5-7.)  The MOU that Eastco had entered into as of May 4, 2012 bound the parties to that agreement for a period of due diligence not to exceed 160 days to complete the final negotiations in good faith. (1/14/15 Eppner Decl., Ex. 23.)  Pape, the principal author of the MOU, testified that "you could probably strain spaghetti through that thing," meaning that the document effectively had no legal effect. (Pape Tr. 253.)  Although Eastco submitted a declaration from Akmad Johari Damanik, an attorney licensed to practice law in Indonesia, asserting that even an oral agreement is binding under Indonesian law (11/14/14 Gordon Decl., Ex. G, ECF No. 142-10), the Court accords greater weight to Pape's testimony in light of his superior knowledge of the specific circumstances of the MOU.

Manon Manugra, the individual who provided consulting services to Eastco on the ground in Indonesia, testified that Eastco could have obtained the absolute right to extract and remove minerals for a fee of $500,000, and stated that Eastco's financial inability to pay such a fee was the only reason why Eastco was unable to proceed with its Indonesian mining operations. (10/31/14 Kessler Decl., Ex. 13, Manugra Aff. ¶¶ 4-5, ECF No. 137-13.)  Pape also testified that Eastco wouldn't be able to enter into any binding deal with Surya until Eastco had proof of funding. (Pape Tr. 348-49.)  The MOU, however, does not state that the joint venture was contingent only on Eastco's ability to secure funding. (See 1/14/15 Eppner Decl., Ex. 23.)  Pape, moreover, testified that he never saw documentation the Surya actually owned the mining rights to be used by Eastco in the joint venture and stated that he would not have realistically been able to provide such documentation to Signet even if Surya was the true owner. (Pape Tr. 195-97.)  Weighing the evidence, the Court finds that Eastco remained several steps removed from accomplishing a joint venture and that Eastco never fully disclosed the actual status of the joint venture to Signet or informed Signet that it could or would obtain any desired documentation once Signet had obtained signed purchase agreements from the owners of the life insurance policies that would comprise the SLS Portfolio. The record does not, applying a preponderance of the evidence standard, support the inference that Signet's entering into purchase agreements for the insurance policies would have cleared any existing roadblocks preventing Eastco's local Indonesian counterparty from signing a more formal, binding joint venture agreement.

Eastco's joint venture efforts in May 2012, the Business Plan "might be misleading." (Pape Tr. 258.)

The evidence demonstrates that whatever the realities of Eastco's business plan/efforts to establish a joint venture, Signet and the other service providers engaged to facilitate the transaction reflected in the Retention Agreement did undertake certain of the requisite steps. For instance, Signet performed extensive services in the identification and accumulation of the policies that would comprise the SLS Portfolio. Giuffre, an actuarial specialist at RSL, worked with Eppner and Ian Subel of SILS to test the pool of approximately 960 policies identified by SILS and narrow it down to a final SLS Portfolio of approximately 300 policies based on assumed terms of the anticipated Notes to be sold to investors. (10/31/14 Kessler Decl., Ex. 4, Giuffre Tr. 74-79, ECF No. 137-4; 10/31/14 Kessler Decl., Ex. 11, Subel Decl. ¶ 12, ECF No. 137-11.) Subel also worked with RSL to determine an acceptable pricing range for the policies based on RSL's modeling and then presented that pricing range to potential sellers of the policies. (1/14/15 Eppner Decl. ¶ 41.) Signet also prepared Deal Books used to stimulate underwriter interest and in connection with meetings with prospective underwriters. (1/14/15 Eppner Decl. ¶ 42.) Signet also approached several potential underwriters for retention for the project and pursued extensive discussions with one underwriter in particular, The Seaport Group. (1/14/15 Eppner Decl. ¶¶ 43-50.) However, the retention of an underwriter was never finalized. (See 1/14/15 Eppner Decl.)

2.   <u>End of the Parties' Relationship</u>

The ducks were decidedly not lined up in a row by the originally projected closing for the Notes offering of mid-July to mid-August 2012.  Much still had to be done on all sides.  In August 2012, a fee dispute arose between Eastco and RSL; that dispute was resolved in an arrangement that Signet deemed unworkable as a practical matter, leading to RSL's ultimate termination from the project.  (1/14/15 Eppner Decl. ¶ 71; 1/28/15 Eppner Decl. ¶ 24.)  RSL terminated its involvement with Eastco's project by email on September 25, 2012.  (<u>See</u> 1/28/15 Eppner Decl., Ex. E, ECF No. 180-5.)

In late August 2012, Signet lined up Actuarial Risk Management ("ARM") as a replacement for RSL, but Signet ceased pursuing ARM when the entire project was abandoned.  (1/14/15 Eppner Decl. ¶ 72.)  As a result of Seaport's slow progress on the project, between August 2012 and December 2012, Signet voluntarily agreed to work without imposing contracted-for charges to Eastco.  (1/14/15 Eppner Decl. ¶ 74; 11/14/14 Eppner Decl. ¶ 11.)  On August 18, 2012, Feldman instructed Eppner to return a $50,000 retainer that Eastco had previously delivered to Signet for eventual transfer to the law firm of Daniel Passage, who had been chosen as Lead Deal Counsel for the project.  (1/14/15 Eppner Decl. ¶ 36; <u>see also</u> 1/14/15 Eppner Decl., Ex. 6, ECF No. 171-6.)

Over the course of September 2012, Deneault sent several emails to Eppner and Simmers inquiring as to the status of Signet's progress with Seaport.  (1/14/15 Eppner Decl., Exs. 33-36, ECF Nos. 171-33-36.)  On October 23, 2012, Deneault followed up with another email to Eppner and Simmers to check on the status of the

project.  (1/14/15 Eppner Decl., Ex. 37, ECF No. 171-37.)  In these emails, Eastco never referenced Signet's failure to obtain signed purchase agreements for the life insurance policies and did not mention an August 18, 2012 deadline for completion of the Closing.  (1/14/15 Eppner Decl. ¶¶ 34-35, 78; 1/12/15 Simmers Decl. ¶ 10.)  On October 25, 2012, Feldman sent an email to Richard Green, Eppner's attorney, discussing the prospect of litigation over the project.  (1/14/15 Eppner Decl., Ex. 38, ECF No. 171-38.)  After a series of emails back and forth between representatives of Signet and Eastco discussing a potential release and settlement agreement to avoid litigation, in a December 29, 2012 email Signet's attorney effectively stated that Signet was terminating its relationship with Eastco and treating the matter as a threatened litigation.  (1/14/15 Eppner Decl., Ex. 39, ECF No. 171-39.)

Thereafter, Eastco brought its claim that Signet breached Section II.A.6 of the Retention Agreement, depriving Eastco of any meaningful opportunity to raise capital to finance its business.  (12/30/14 Deneault Decl. ¶ 3, ECF No. 166-2.)

III.   CONCLUSIONS OF LAW

A.   Legal Standards

If a contract is clear and unambiguous, Delaware courts "give effect to the plain-meaning of the contract's terms and provisions."[14]  Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1159-60 (Del. 2010); see Lorillard Tobacco Co. v. Am. Legacy

---

[14] The Retention Agreement contains a choice of law provision stating that it is governed by Delaware law.  (Retention Agreement § XII.A.)  Although in its decision on defendants' motion to dismiss the Court applied New York law (see ECF No. 52), it did so because the parties assumed that New York law applied to this action in their motion to dismiss briefing (see ECF Nos. 37, 43, 49).  In their filings relating to the motions for summary judgment and for partial findings, the parties now appear to agree that Delaware law governs this action.

Foundation, 903 A.2d 728, 739 (Del. 2006) ("When the language of a . . . contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented."). If the plain language of a contract is unambiguous, the Court "will not resort to extrinsic evidence to determine the parties' intentions." BLGH Holdings LLC v. enXco LFG Holdings, LLC, 41 A.3d 410, 414 (Del. 2012); see Galantino v. Baffone, 46 A.3d 1076, 1081 (Del. 2012) ("The parol evidence rule bars the admission of evidence extrinsic to an unambiguous, integrated written contract for the purpose of varying or contradicting the terms of that contract."); O'Brien v. Progressive N. Ins. Co., 785 A.2d 281, 289 (Del. 2001) (Delaware courts may "not to look to extrinsic evidence to find ambiguity."). "Under Delaware law, '[w]here a contract is executed which refers to another instrument and makes the conditions of such other instrument a part of it, the two will be interpreted together as the agreement of the parties.'" Golovan v. Univ. of Delaware, 73 F. Supp. 3d 442, 453 n.2 (D. Del. 2014) (quoting Lipson v. Anesthesia Servs., P.A., 790 A.2d 1261, 1278 (Del. Super. Ct. 2001)).

When the Court "may reasonably ascribe multiple and different interpretations to a contract," the Court will find that the contract is "ambiguous." Osborn ex rel. Osborn, 991 A.2d at 1160; see Lorillard Tobacco Co., 903 A.2d at 739 ("[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."). "[I]f there is more than one reasonable interpretation of a disputed

contract term, consideration of extrinsic evidence is required to determine the meanings the parties intended." AT&T Corp. v. Lillis, 953 A.2d 241, 253 (Del. 2008). Such extrinsic evidence may include "evidence of prior agreements and communications of the parties as well as trade usage or course of dealing." Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1233 (Del. 1997). "[R]elevant extrinsic evidence is that which reveals the parties' intent *at the time they entered into the contract* [and] backward-looking evidence gathered after the time of contracting is not usually helpful." Id. at 1233 n.11 (emphasis in original).

"[W]here possible, a court should give effect to all contract provisions." Sonitrol Holding Co. v. Marceau Investissements, 607 A.2d 1177, 1184 (Del. 1992). "Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." DCV Holdings, Inc. v. ConAgra, Inc., 889 A.2d 954, 961 (Del. 2005). "[T]he role of a court is to effectuate the parties' intent." Lorillard Tobacco Co., 903 A.2d at 739. The inquiry is "not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." Id.

   B.   Analysis

Eastco premises its breach of contract claim on two similar theories of breach—both of which arise under Section II.A.6 of the parties' Retention Agreement. Eastco's first theory—the only one it raised in its summary judgment briefing—is that Signet breached Section II.A.6 by failing to "acquire" the SLS Portfolio prior to the Closing of the Notes offering. The Closing, of course, was a

stage that the financing project never reached.  According to Eastco, Signet was obligated to use capital from some source other than the Notes' sale proceeds to finance the acquisition of the SLS Portfolio.  Eastco's second theory, which it first asserted at the eleventh hour in this litigation, is that Signet breached Section II.A.6 by failing to "obtain" signed purchase agreements for the life insurance policies that would comprise the SLS Portfolio prior to the Closing of the Notes offering and by failing to effectuate the Closing (and thus the steps preceding it) on or before August 18, 2012.[15]  In its final brief, filed in opposition to Signet's motion for partial findings, Eastco again modifies this theory by arguing that Signet breached its duty to obtain signed purchase agreements and then assign the purchase agreements to the Irish Issuer before the pre-Closing.[16]  As set forth below, the Court concludes that neither theory stands up under the plain terms of

---

[15] Eastco did not raise this newfound theory until after the Court's December 3, 2014 status conference, at which the Court expressed skepticism as to Eastco's previously laid out first theory. Even though the Court may have discretion to reject Eastco's attempt to assert a new theory at such a late stage of the proceeding, see, e.g., Family Dollar Stores, Inc. v. United Fabrics Int'l, Inc., 896 F. Supp. 2d 223, 235 (S.D.N.Y. 2012) (denying leave to amend where amendment constituted "a blatant attempt to change the theory of the case after the close of discovery"); cf. Arrowood Indem. Co. v. King, 699 F.3d 735, 742 (2d Cir. 2012) (affirming denial of motion to amend as adjunct to motion for reconsideration where the plaintiff sought "leave to allege an entirely new factual and legal basis" for its claims), the Court rejects Eastco's second breach theory on the merits, rather than on the ground that it was raised untimely.

[16] Notably, Eastco does not assert that Signet breached the Retention Agreement by severing ties with Eastco in December 2012, despite the fact that Eastco is the only party that had a clear right of termination in the Retention Agreement.  That termination provision states that Eastco may terminate the contract "at any time, with or without cause, without penalty" by giving Signet as least ten days' prior written notice.  (Retention Agreement § VIII.A.2.)  Signet did not have a similarly defined right under the contract.  The Court, however, notes Signet's argument that it also had the right to "abandon" the project under Section II.A.5, which states that Signet "confirms that it believes the [financing] can, and will, be completed within, and the Closing will occur at the end of a period of three (3) to four (4) months . . . subject to delays or abandonment . . . due to matters of *force majeure* such as . . . the inability of [Signet or RSL] to perform its duties as set forth or described herein."  (Retention Agreement § II.A.5.)  Because Eastco has never contended that Signet breached the Retention Agreement by terminating the parties' relationship despite having numerous opportunities to make such an argument, the Court does not determine whether Signet acted within its right to "abandon" the project in December 2012.

the contract or when those terms are read in conjunction with the extrinsic evidence put forward by the parties.

As required by Delaware law, the Court begins with the plain meaning of the Retention Agreement to determine if the terms at issue are subject to one reasonable interpretation. As set forth below, the Court believes that the plain meaning of Section II.A.6, as informed by other provisions of the Retention Agreement and the Proposal Letter, appears to be sufficiently clear such that the Court could rule in Signet's favor as a matter of law without having to consider the extrinsic evidence. In an abundance of caution, however, the Court also considers the terms of the contract in light of the parties' extrinsic evidence. The Court concludes that the weight of the extrinsic evidence confirms the plain meaning interpretation adopted by the Court. Although those conclusions alone would be sufficient to dismiss Eastco's breach of contract claim, the Court also concludes that Signet's failure to perform whatever obligation it had to acquire the SLS Portfolio or obtain the policy purchase agreements was excused, at least temporarily, by Eastco's failure to perform conditions precedent to those steps. Finally, the Court also concludes that Eastco has failed to show by a preponderance of the evidence that Signet's purported breach of Section II.A.6 caused it damages.

1.   <u>Plain Meaning</u>

Eastco's two theories of breach both rest on Signet's obligations under Section II.A.6 of the Retention Agreement. Pursuant to Section II.A.6, Signet was obligated, between the effective date of the Retention Agreement and the "completion of the Closing," to perform "specific services with respect to the

identification, accumulation and acquisition of the SLS Portfolio," including "[a]ll services deemed necessary or appropriate, applying normal and customary industry standards, for the acquisition by and transfer to the Issuer and the Custodian Bank . . . of such Approved Assets, including steps to assure, under commercially reasonable standards that are normal and customary in the industry, the legal transfer of each and all of such Approved Assets."  (Retention Agreement § II.A.6.) The "Closing" is defined as "the closing of the offering and sale of the Notes to the Investors."  (Retention Agreement App. 1.)[17]  The "Closing," therefore, effectively refers to the final stage of the financing process.  The Retention Agreement does not itself state how far in advance of the "completion of the Closing" any of the actions listed in Section II.A.6 were to occur.  Standing on its own, Section II.A.6 is ambiguous as to when Signet's performance of the tasks enumerated in this provision were due.  Any ambiguities, however, are resolved by the Proposal Letter, which is incorporated into and made part of the Retention Agreement.  The Proposal Letter explains the services that would be "deemed necessary or appropriate" at the various stages of the financing process.  While that document also does not precisely lay out exactly when each of the sequenced steps in the various parallel tracks contemplated in the contract will occur relative to one another, the Proposal Letter does provide informative context with respect to Signet's duties at each step.

---

[17] There is no evidence in the record supporting the proposition that "normal and customary" standards in the industry include acquisition of the policies by the advisory entity (e.g., an entity in Signet's position.).

With respect to Eastco's original theory—that Signet failed to itself acquire the SLS Portfolio prior to the Closing—the plain language of the Retention Agreement, as supplemented by the Proposal Letter, shows that Signet was never obligated to do so.  The SLS Portfolio was not intended to be acquired by any entity until the Closing of the Notes offering or some moment proximate to it.[18]  While the Retention Agreement does not specify how far in advance of the "completion of the Closing" the acquisition of the SLS Portfolio would occur, the Proposal Letter clearly shows that Eastco's theory is mistaken.  The Proposal Letter states that part of the net proceeds of the sale of the Notes would be used to acquire the SLS Portfolio.  (Proposal Letter at 8, 11.)  If the proceeds of the sale of the Notes were to be used to acquire the SLS Portfolio, then the SLS Portfolio could not be acquired until the occurrence of the Closing, the time at which the Notes would be sold.  The Closing was the final stage of the financing process, which the parties did not come close to reaching when the parties severed their relationship.  This understanding is fully consistent with Section II.A.6's requirement that the SLS Portfolio be acquired before the "completion of the Closing", as the Closing would not be "complete" until it was finished.  See COMPLETION, Merriam Webster Dictionary (available at http://www.merriam-webster.com/dictionary/completion) ("the act or process of

---

[18] The Court's reasoning in its denial of Signet's motion to dismiss Eastco's first amended complaint is not to the contrary.  In relation to that motion, Signet made a far broader argument—which the Court rejected—that its role was merely advisory and consultative and that it was under no obligation to affirmatively advance the financing scheme by identifying, accumulating or acquiring the SLS Portfolio (and that none of these steps needed to be taken prior to the Closing), notwithstanding the express language of Section II.A.6.  (See ECF No. 52.)  Signet's (and Eastco's) arguments are far different than they were at that initial stage, and the Court has properly augmented its analysis based on the parties' current contentions.

completing or finishing something"); see also Lorillard Tobacco Co., 903 A.2d at 738 ("[D]ictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract."). This interpretation also finds support from the surrounding language of the Retention Agreement. Section I.B states that the proceeds of the Notes offering "shall be applied, first, to provide $50,000,000 to the Project, and then to acquire and hold, in a custodial account . . . the SLS Portfolio purchased from or through [SILS]." (Retention Agreement § I.B.) This necessarily assumes that the SLS Portfolio would not be purchased until the proceeds of the Notes offering had been obtained from investors.

Significantly, the Retention Agreement itself also contradicts Eastco's claim that Signet, as opposed to some other service provider, was obligated to acquire the SLS Portfolio. The Retention Agreement expressly disclaims any duty on the part of Signet to acquire assets of any type, stating that "Nothing herein shall require that [Signet] purchase or otherwise acquire any securities or other assets, or any interests therein, and nothing herein shall preclude [Signet] from purchasing any securities, other than Notes, in the ordinary course of its business."[19] (Retention Agreement § XIII.C.) This provision, which explicitly addresses whether Signet had

---

[19] Eastco's reliance on the phrase "in the ordinary course of its business" for the proposition that Section XIII.C solely addresses actions that Signet may permissibly take unrelated to the financing project strains the language of the sentence. Read as a whole, it is clear that the phrase "in the ordinary course of its business" only modifies the clause stating that nothing in the Retention Agreement precludes Signet from purchasing any securities other than the Notes being offered as part of the financing.

any obligation to purchase any assets, controls because Section II.A.6 says nothing to the contrary.

Eastco's second theory—that Signet breached its obligation to obtain signed purchase agreements from the owners of the policies that would comprise the SLS Portfolio and transfer those policies to the Irish Issuer prior to the Closing (or prior to the pre-Closing)—finds no support in the language of the Retention Agreement. Eastco's theory also does not accord with the staging of the financing process described in the Proposal Letter. Eastco's new theory has two components: first, that Signet had to obtain signed purchase agreements for the life insurance policies, and second, that Signet had to do so (and ensure the Closing of the Notes offering) on or before August 18, 2012 (i.e. exactly four months after the execution of the Retention Agreement).

As to the first component, it is worth noting at the outset that Section II.A.6 nowhere includes an obligation that Signet must itself "obtain" anything. Rather, Section II.A.6 required Signet to perform "specific services with respect to the identification, accumulation and acquisition of the SLS Portfolio," which included the obligation to identify the assets and engage in "[a]ll services deemed necessary or appropriate . . . for the acquisition by and transfer to the Issuer and the Custodian Bank . . . of such Approved Assets." (Retention Agreement § II.A.6.) Eastco does not identify what it means by "obtain" and does not explain whether this obligation refers to Signet's duty to perform specific services with respect to "identification," with respect to "accumulation," or with respect to "acquisition."

While Section II.A.6 obligated Signet to perform services as to identification, accumulation and acquisition of the SLS Portfolio over the duration of the financing process, the contract presumes that those services would be sequenced over time and dependent upon the successful completion of earlier steps.  As discussed below, even if Signet was eventually required to obtain signed purchase agreements from the institutions that owned the life insurance policies, the project never reached the stage at which Signet would have had to enter into those purchase agreements.

Eastco's purchase agreement theory closely resembles its original SLS Portfolio acquisition theory, with the primary distinction being that Eastco now latches onto a new event that necessarily had to occur earlier in the sequence of steps than the actual acquisition of the SLS Portfolio.  The theory fails for similar reasons.  Eastco does not point to any language in the contract documents showing that Signet was obligated to enter into purchase agreements before Signet secured an underwriter for the project or before it became clear that a Closing for the Notes offering was imminent (i.e. that investors had been identified and expressed an intent to purchase the Notes).[20]  In light of the staged process laid out in the Proposal Letter, which details the multiple stages and parallel tracks of the process that all converge close to the time of the Closing (Proposal Letter at 11), it is clear that any obligation to enter into purchase agreements was not due to be performed

---

[20] Eastco's newfound theory rests almost exclusively on extrinsic evidence in the form of Eppner's declaration in support of Signet's motion for summary judgment.  Such evidence cannot alter the plain meaning of the Retention Agreement and the Proposal Letter to the extent the contract is susceptible to only one reasonable interpretation.  But, even when taking the extrinsic evidence into account, the Court concludes that the weight of the extrinsic evidence does not support Eastco's reading.

until a later stage of the process never reached by the parties, as would be appropriate "under commercially reasonable standards that are normal and customary in the industry."  (Retention Agreement § II.A.6.)  The process outlined in the Proposal Letter makes clear that the pre-Closing would occur subsequent to the negotiation of the underwriter's retention and delivery of the private placement memorandum, events that were not completed before the parties ceased to pursue the project.  (Proposal Letter at 11).

As for the second component of Eastco's new theory—that Signet had to effectuate the Closing on or before August 18, 2012 (and obtain the purchase agreements prior to that date)—neither the Retention Agreement nor the Proposal Letter contain any language showing that the parties committed to a hard-and-fast deadline by which time the Closing was required to take place.  It is true that in Section II.A.5 of the Retention Agreement Signet "confirm[ed] that it believe[d]" that the Closing would occur within a period of three or four months (i.e. by July 18, 2012 or August 18, 2012) and that the Proposal Letter in several instances contemplates a total timeline for the financing project of three to four months.  (Retention Agreement § II.A.5; Proposal Letter at 3-5, 11.)  But none of those statements is expressed as a deadline.  Rather, those representations are framed in terms of Signet's <u>belief</u> as to what might be accomplished based on its prior experience.  The timeline was an estimate resting on the assumption that everything would proceed as anticipated.  For that reason, Section II.A.5 includes caveats, stating that the timeline is subject to "delays or abandonment . . . due

matters of _force majeure_ such as . . . the inability of [Signet] or [RSL] to perform their duties."  (Retention Agreement § II.A.5.)  The Proposal Letter also includes caveats as to the estimated timeline, stating that meeting the anticipated timeline would require "the cooperative, dedicated efforts of all involved."  (Proposal Letter at 5.)  While a Court must in certain instances determine a reasonable time for performance when a contract omits such a term, see Comet Sys., Inc. Shareholders' Agent v. MIVA, Inc., 980 A.2d 1024, 1034 (Del. Ch. 2008), upon construing the contract documents as a whole, it is clear that any obligation Signet had to acquire the SLS Portfolio, obtain purchase agreements for the life insurance policies underlying the SLS Portfolio, or ensure the Closing, were event-based and not intended to be tethered to specified dates.  To the extent that Eastco's argument may be construed as a claim that Signet breached the Retention Agreement simply because no Closing ever in fact occurred, Eastco readily admits that neither the Retention Agreement nor the Proposal Letter contain a guarantee of success.  A plain reading of the Retention Agreement and the Proposal Letter thus do not support Eastco's theory that Signet breached the contract by failing to obtain signed purchase agreements prior to August 18, 2012.[21]

---

[21] The Court rejects Eastco's argument that if the Retention Agreement does not obligate Signet to acquire the SLS Portfolio or obtain purchase agreements prior to the Closing (to take place by a date certain), then the contract essentially allowed Signet to sit on its hands and reap tens of thousands of dollars in unjustified monthly fees.  The Retention Agreement obligated Signet to take numerous prior steps, including identifying and accumulating the policies that would make up the SLS Portfolio, organizing and identifying the various entities that would play the various roles contemplated by the Retention Agreement, and finding and working with an underwriter to solicit investor interest.  The weight of the evidence shows that Signet did take substantial steps (in light of the circumstances) toward completing these tasks and that Signet did act consistently with an intent to move toward a successful Notes offering.  (See, e.g., Giuffre Tr. 74-79; 10/31/14 Kessler Decl., Ex. 11, Subel Decl. ¶ 12, ECF No. 137-11; 1/14/15 Eppner Decl. ¶¶ 41-42.)

To the extent that Eastco contends that it should not be bound by the plain terms of the contract because its principals did not understand the sequencing process or the express language of the relevant documents, that argument is meritless. A contracting party is deemed to have read and understood the terms of the contract. See Pellaton v. Bank of New York, 592 A.2d 473, 477 (Del. 1991); Graham v. State Farm Mut. Auto. Ins. Co., 565 A.2d 908, 913 (Del. 1989). A party's subjective intent and understanding is therefore irrelevant to the determination of plain meaning. It does not help Eastco that Deneault instructed Feldman, Eastco's attorney, to not read the Retention Agreement. (See Deneault Tr. 126-28; Feldman Tr. 92.). Eastco represented that it "read th[e] Agreement and [] received such legal and other counsel and advice as it deemed necessary or appropriate for its full and complete understanding of the terms, provisions and conditions." (Retention Agreement at 29.) Eastco is thus bound by the plain meaning of the contract and it offers no justification for setting those terms aside.

## 2.    Extrinsic Evidence

Although the Court believes that the plain meaning of the Retention Agreement, when construed as a whole in conjunction with the Proposal Letter, appears to be sufficiently clear such that Eastco's theories of breach are foreclosed, the Court recognizes that there would be at least some basis to determine that the contract is ambiguous given that it does not precisely identify the timing of Signet's duties under Section II.A.6. Out of an abundance of caution, therefore, the Court also weighs the extrinsic evidence to determine the most reasonable interpretation of the parties' conflicting readings. Upon carefully weighing that evidence, the

Court concludes that Signet's interpretation is correct and that Signet did not breach Section II.A.6 by failing to acquire the SLS Portfolio or obtain signed purchase agreements for the life insurance policies before August 18, 2012.

There is ample extrinsic evidence to reject Eastco's theory that Section II.A.6 required Signet to acquire the SLS Portfolio prior to the Closing of the Notes offering.  Eppner testified that he participated in a March 2012 conference call with Simmers, Deneault and Pape in which he laid out the financing process, including by explaining that a considerable balance of the Notes' proceeds would be used to acquire the SLS Portfolio and fund a cash reserve that would service the premiums on the policies.  (1/14/15 Eppner Decl. ¶ 6.)  That conference call is probative because Eppner testified that the parties intended the Proposal Letter to be a memorialization of the substance of that call.  (1/14/15 Eppner Decl. ¶ 8.)  Moreover, every witness involved in the financing project, including individuals acting on behalf of Eastco, testified to their understanding that the proceeds from the sale of the Notes would be used to acquire the life insurance policies.  Those witnesses include Deneault, Feldman, Giuffre and Santos.[22]  (Deneault Tr. 68, 74; Feldman Tr. 78; Giuffre Tr. 63-65; 10/31/14 Kessler Decl., Ex. 5, Santos Tr. 118-20, ECF No. 137-5.)  Eastco's contention that the acquisition of the SLS Portfolio and the raising of funds through the Notes offering was a two-step process is beside the point—even if technically separate, these two steps had to occur in tandem and it is clear that

---

[22] While portions of certain of these witnesses' testimony appears to have been at odds with that understanding, the Court, in weighing the evidence, finds by a preponderance of the evidence that these individuals knew that the SLS Portfolio would not actually be acquired until the occurrence of the Notes offering.

the project never reached a sufficiently advanced stage to approach these final steps, regardless of the order in which they were supposed to take place.  Finally, the fact that Eastco has provided no evidence that it investigated or inquired into Signet's financial ability to acquire the SLS Portfolio, which Pape and Feldman understood would have cost hundreds of millions of dollars to acquire (Pape Tr. 403-04; Feldman Tr. 76-77), supports the notion that Eastco never contemplated that Signet itself would have had to undertake such a substantial financial transaction.

The weight of the extrinsic evidence also belies Eastco's second theory that Signet had a duty to obtain the purchase agreements prior to August 18, 2012. Finding limited support in the language of the Retention Agreement or Proposal Letter, Eastco relies primarily on Eppner's testimony in his declaration in support of Signet's motion for summary judgment.  In that testimony, Eppner stated that "[t]he Issuer and the Management Company are organized immediately before the pre-Closing, when the SLS Portfolio purchase agreements are assigned to the Issuer by SILS, and must be ready to perform their duties from and after the Closing." (11/14/14 Eppner Decl. ¶ 6.)  Eppner testified that "such purchase agreements are entered into on a 'subject to completion of financing by a prescribed date basis' and are collected and reviewed at the pre-Closing, which would be scheduled to precede the Closing by about two weeks."  (11/14/14 Eppner Decl. ¶ 5.)  Nevertheless, Eastco contends that Eppner's testimony proves that Signet would have had to obtain the purchase agreements before those agreements could be assigned to the Issuer and

that as a result this would have to occur before the "pre-Closing" of the Notes offering.

To the extent that Eastco argues that Signet breached the Retention Agreement by failing to take this step, Eastco stretches Eppner's testimony too far. While Eppner's testimony cited above does show that Signet would have had to gather the signed purchase agreements for the life insurance policies prior to the pre-Closing, the weight of the evidence shows that the financing process did not reach the advanced stage at which it would have been necessary or appropriate for Signet to have taken this action.  Tracing the sequencing laid out in the Time Table incorporated into the Proposal Letter, Eppner subsequently clarified in later testimony that the underwriter's retention and delivery of the private placement memorandum would occur about halfway through the overall financing process and that the pre-Closing would occur at the end of the process just prior to the Closing. (1/28/15 Eppner Decl. ¶ 5; see 1/28/15 Eppner Decl., Ex. A, ECF No. 180-1.)  The process contemplated that the policy purchase agreements would not be entered into until shortly before the pre-Closing and the staging of the various steps throughout the process made clear that Signet's obligations in connection with any particular event would not arise unless and until the steps preceding that event in the sequence had been accomplished.  (1/28/15 Eppner Decl. ¶¶ 5-6.)

The weight of the evidence also shows that the owners of the insurance policies—who consist of a limited number of sophisticated financial institutions— would not sign policy purchase agreements, which would be entered into on a

"subject to completion of financing by a prescribed date" basis, until shortly before the pre-Closing once it was evident that the Closing was very likely to occur. (1/14/15 Eppner Decl. ¶¶ 27, 30.)  The evidence supports the conclusion that the purchase agreements would not be entered into until after the underwriter had been obtained and after the underwriter had identified the investors for the Notes. (1/14/15 Eppner Decl. ¶ 30.)  As the weight of the evidence shows, an insurance policy owner would not enter into a purchase agreement too far out in advance of the Closing because doing so would provide the purchaser with a riskless "free" option that would subject the seller to the risk of unacceptable economic consequences such as the death of an insured, effectively giving the insurance policy buyer the contract right to purchase cash for a fraction of the actual amount of the death benefit.  (1/14/15 Eppner Decl. ¶¶ 30-32; 1/28/15 Eppner Decl. ¶¶ 10-11.)

Finally, the parties' course of dealing further confirms this understanding of the contract.  The evidence shows that Eastco never faulted Signet for its failure to obtain the purchase agreements (at least prior to raising this breach theory subsequent to the summary judgment stage of this litigation).  (1/14/15 Eppner Decl. ¶ 34.)  Eastco presented no evidence suggesting that it ever even inquired into Signet's progress in obtaining life insurance policy purchase agreements or that it objected when August 18, 2012 came and went without the completion of the Closing (or without a Closing date even having been set).[23]  (See 1/14/15 Eppner Decl. ¶ 35; 1/14/15 Simmers Decl. ¶ 10.)  Eastco presented no contemporaneous

---

[23] Eastco's August 18, 2012 request for the return of $50,000 being held by Signet to pay Dan Passage, the special lead deal counsel, did not indicate that Signet had missed a deadline or that the financing plan was being terminated due to a breach.  (See 1/14/15 Eppner Decl., Ex 6.)

evidence showing that it ever referenced a Closing deadline of August 18, 2012 and never made such a reference even after it was threatening Signet with litigation. (See 1/14/15 Eppner Decl. ¶ 78.)  In contrast, the evidence shows that the parties exchanged several emails from September through October 2012 in which Deneault inquired as to the status of Signet's dealings with Seaport, the prospective underwriter for the financing.  (See 1/14/15 Eppner Decl., Exs. 33-37, ECF Nos. 171-33-37.)  Those emails make probative Eastco's silence as to the issue of Signet's obtaining of purchase agreements and of a deadline for the Closing.

3.    Signet's Excuse for Non-Performance

The parties do not dispute that Signet never acquired the SLS Portfolio or obtained signed purchase agreements from the owners of the life insurance policies that would comprise the SLS Portfolio.  Signet contends that even if its failure to take those actions did constitute a breach of the Retention Agreement, that breach is nonetheless excused by Eastco's own breaches of its disclosure obligations.  These purported disclosure violations include Eastco's misrepresentation as to the status of its joint venture and acquisition of mining concessions, its failure to provide an update regarding a precipitous drop in the world iron ore market, and its failure to disclose that $1 million of the proceeds of its $50 million loan would be used to pay a finder's fee rather than for the purpose of implementing the Business Plan.  The Court agrees.

Under Delaware law, "[a] party is excused from performance under a contract if the other party is in material breach thereof."  Biolife Solutions, Inc. v. Endocare, Inc., 838 A.2d 268, 278 (Del Ch. 2003).  "The question whether the breach is of

sufficient importance to justify non-performance by the non-breaching party is one of degree and is determined by weighing the consequences in the light of the actual custom of men in the performance of contracts similar to the one that is involved in the specific case." Id. (quotation marks omitted); see Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc., C.A. No. 5886VCP, 2013 WL 3934992, at *10 (Del Ch. July 24, 2013) ("A breach of contract will terminate a contract . . . where the failure of performance on the part of the other [party] go[es] to the substance of the contract." (quotation marks omitted)).

Pursuant to Section I.C of the Retention Agreement, Eastco was required to "promptly notify [Signet], in writing, in the event of any change or event that is likely to affect [Eastco's] Business Plan in any material respect or create a materially adverse outcome for the transactions contemplated." (Retention Agreement § I.C.) Section VI.A.3 obligated Eastco to "take all reasonably necessary or advisable actions . . . to ensure the ongoing accuracy and completeness of its respective representations and warranties that are set forth in this Agreement." (Retention Agreement § VI.A.3.) Eastco also represented and warranted that "[i]t has not undertaken any action that would render any statement of material fact in the Private Placement Memorandum to be incorrect or misleading." (Retention Agreement § VII.A.5.) Eastco thus had a duty to ensure that the Business Plan, a

document upon which the prospective underwriter and potential investors would be relying, was up-to-date and accurate.[24]

Weighing the evidence, the Court finds that Eastco failed to comply with its disclosure obligations because the Business Plan did not accurately describe the status of Eastco's Indonesian joint venture. The Business Plan stated that Eastco "is engaged through a 60%-owned joint venture" in Indonesia. (Business Plan at 1.) Discovery in this action revealed that Eastco's statement was false. Eastco only had a non-binding Memorandum of Understanding with an individual named Surya, and Pape testified that Eastco did not have written proof that Surya owned the mining concession rights in question. (See 1/14/15 Eppner Decl., Ex. 23; Pape Tr. 195-97.) While the Court concludes that Eastco did breach the Retention Agreement by failing to accurately characterize the status of its Indonesian project, the Court also concludes that Eastco's breach was not sufficiently material to the entire substance of the contract such that Signet had the right to immediately terminate the agreement upon learning the true status of Eastco's business.[25]

---

[24] Weighing the evidence, the Court concludes that the May 18, 2012 Business Plan was the operative Business Plan for purposes of the Retention Agreement. (See 10/31/14 Kessler Decl., Ex. 21 ("Business Plan").)

[25] The Court concludes that to the extent that Eastco also breached the Retention Agreement by failing to disclose to Signet the drop in the iron ore market or the $1 million finder's fee to be paid to Santos and Lyle upon the successful completion of the project, these breaches were also not material such that they would excuse Signet from any further performance. The Court makes this determination notwithstanding that the Business Plan identifies a "market price collapse" as a risk that could "negat[e] the opportunity." (Business Plan at 19). The Court finds significant that any breach relating to these two issues could not have caused Signet's breach because Eastco did not become aware of this information until it obtained discovery in this litigation, after Signet had terminated its relationship with Eastco.

The Court also rejects Signet's argument that its obligation to undertake any further performance was excused under the doctrine of impossibility. Under that doctrine, if "a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-

That being said, the Court does find that Eastco's failure to provide documentation relating to its operations—information that was necessary to secure participation of an underwriter—was sufficient to excuse any obligation that Signet had to obtain signed purchase agreements for the life insurance policies, at least until Eastco provided the information that would have allowed Signet to secure an underwriter.  See AQSR India Private, Ltd. v. Bureau Veritas Holdings, Inc., C.A. No. 4021-VCS, 2009 WL 1707910, at *7 n.25 (Del. Ch. June 16, 2009) ("It is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." (quoting Restatement (Second) of Contracts § 237 (1981))); see also Restatement (Second) of Contracts § 225(1) (1981) ("Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused.").  The Court concludes that Signet could not secure participation of an underwriter unless or until Eastco provided Signet pertinent documentation relating to its business. Providing such information was a necessary step to allow Signet to secure the participation of an underwriter and obtain sufficiently concrete expressions of

---

occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or circumstances indicate the contrary." Wal-mart Stores, Inc. v. AIG Life Ins. Co., 901 A.2d 106, 113 (Del. 2006).  That Eastco's business did not turn out to be at as advanced a stage as Signet hoped did not render any further performance by Signet excused in light of the fact that Signet knew that Eastco was not yet operating at the time the parties entered into the Retention Agreement.  (E.g., 11/14/14 Deneault Decl. ¶ 24; Proposal Letter at 3 (stating that "[Eastco] and the Project certainly appear at this juncture to meet our requirements").)  Further, because Signet did not become aware of Eastco's limited progress in setting up a joint venture until the discovery stage in this litigation, that information could not have been the cause of Signet's failure to perform.

interest from potential investors in the Notes, and ultimately effectuate a Closing for the Notes offering.[26]  (E.g., 1/14/15 Eppner Decl. ¶¶ 32-33.)

It is impractical to imagine that an underwriter or investor would participate in a $50 million loan transaction without having a reasonable basis to believe that the loan could be paid back.  (1/14/15 Eppner Decl. ¶ 68.)  Provision of such information was thus an implied condition precedent to Signet's obligation to take actions required to be performed shortly prior to the pre-Closing for the Notes offering, such as collecting signed purchase agreements.  The weight of the evidence shows that Signet made clear to Eastco that documentary proof of the status of its Indonesian joint venture had to be provided to the underwriter; the evidence shows that Eastco understood this.  (E.g., 1/14/15 Eppner Decl., Ex. 21, ECF No. 171-21; 10/31/14 Kessler Decl., Ex. 24, ECF No. 137-24.)  As Eastco never provided the requisite documentation prior to the termination of the Retention Agreement (and never subsequently provided the information with a demand that Signet perform), Signet continued to be excused from any duty to obtain signed purchase agreements up through the termination of the Retention Agreement.[27]

---

[26] While Signet had a duty to negotiate the retention of an underwriter (Retention Agreement § II.A.8), it made efforts to perform that duty and was unable to do so as a result of Eastco's failure to provide necessary documentation about its business.  The Court notes that Section II.A.8 does not impose an unqualified duty on Signet to retain an underwriter, but rather states that the agreement would be between "the Issuer and the Underwriter."  (Retention Agreement § II.A.8.)

[27] The Court observes that Signet was also potentially excused from performance under Section II.A.5 based on RSL's termination of its relationship with Eastco on September 25, 2012.  (See 1/28/15 Eppner Decl. ¶ 24; 1/28/15 Eppner Decl., Ex. E, ECF No. 180-5.)  Section II.A.5 states that Signet "confirms that it believes the [financing] can, and will, be completed within . . . a period of three (3) to four (4) months . . . subject to delays or abandonment . . . due to matters of _force majeure_ such as . . . the inability of [Signet or RSL] to perform its duties as set forth or described herein."  (Retention Agreement § II.A.5.)  Because Signet did not raise this point until its final reply brief, the

The Court notes, finally, that based on the evidence, Eastco's contention that Signet would have preferred to breach the contract and simply collect its monthly fees without moving toward the completion of the Closing is highly improbable. Most of Signet's fees were back-loaded and contingent on success; it would have earned a success fee of approximately $10 million.  (Proposal Letter at 12-14; <u>see also</u> Retention Agreement § III.B.3; 1/14/15 Eppner Decl. ¶ 10.)

        4.   <u>Causation</u>

Finally, even if the Court were to accept <u>arguendo</u> Eastco's reading of Section II.A.6 and concluded that Signet's breach of that provision was not excused by Eastco's own failure to perform, Eastco would still be required to show that Signet's breach caused it damage.  <u>H-M Wexford LLC v. Encorp, Inc.</u>, 832 A.2d 129, 140 (Del. Ch. 2003) ("Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff.").[28]  The Court concludes that Eastco has not done so, as its claim for damages arising from Signet's purported breach is impermissibly speculative.

Eastco argues that Signet's breach deprived it of the opportunity to obtain a loan to finance its mining business out of a portion of the proceeds of the Notes offering.  Its claim does not actually rest on its failure to obtain a loan (which Eastco knew that Signet was not guaranteeing), but only on the loss of a meaningful

---

Court does not rely on RSL's termination as a basis to excuse any subsequent non-performance by Signet.

[28] Eastco seeks reliance damages, which would include its "expenses of preparation and of part performance, as well as other foreseeable expenses incurred in reliance upon the contract."  <u>Bausch & Lomb Inc. v. Bressler</u>, 977 F.2d 720, 729 (2d Cir. 1992).

opportunity to obtain a loan.  (See 12/24/14 Deneault Decl. ¶ 3.)  The weight of the evidence indicates that even if Signet had obtained signed purchase agreements from owners of qualifying life insurance policies, the actual legal transfer of ownership of those policies would have been dependent on the successful completion of the Closing for the Notes offering.  The parties were several steps away from reaching that stage at the time the Retention Agreement was terminated.  As set forth in detail above, the life insurance policies would not actually have been acquired until the Notes were placed because the SLS Portfolio was to be purchased with part of the proceeds of those Notes.  Furthermore, under a preponderance of the evidence standard, the evidence does not support Eastco's contention that Signet's obtaining of purchase agreements would have significantly increased the likelihood that an underwriter would have placed the Notes, thereby providing Eastco with its sought $50 million loan.  Eastco's understanding of the sequencing of events necessary to complete the Closing conflicts with the plain meaning of the contract documents and the weight of the extrinsic evidence.  That evidence shows that the purchase agreements were to be obtained after the underwriter had been retained and the investors for the Notes offering had been essentially lined up.

IV.    CONCLUSION

For the reasons set forth above, the Court finds in favor of defendant Signet on Eastco's breach of contract claim.  Because the Court denies Eastco's motion for summary judgment on Signet's counterclaim, that claim remains the only live issue in this action.  Therefore, the parties shall, **within 14 days** of the date of this Opinion & Order, confer with each other and submit a letter informing the Court as

to the next appropriate steps to be taken with respect to Signet's counterclaim,

including an indication as to the soonest date on which the parties would be ready

to go to trial on that claim.

The Clerk of Court is directed to close the motions at ECF Nos. 134 and 169.

SO ORDERED.

Dated:      New York, New York
            September 29, 2015

_____
        KATHERINE B. FORREST
        United States District Judge